Filed 11/6/23  P. v. Ramirez CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANGELA JIMENEZ RAMIREZ,<br><br>    Defendant and Appellant. | F084624<br><br>(Super. Ct. No. VCF331361A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Melinda Myrle Reed, Judge.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis Madelyn Vasquez and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Angela Jimenez Ramirez appeals her 2022 conviction for involuntary manslaughter, felony child abuse, and child endangerment resulting in death enhancement.  We affirm, but order the abstract of judgment be amended to reflect that

neither conviction is for a serious or violent felony; that the crime in count 3 is felony child abuse, not assault on a child causing death; and to correct the amount of custody credits.

## STATEMENT OF THE CASE

Angela Jimenez Ramirez and her husband Daniel Ramirez[1] were arrested on October 23, 2014, for the murder of their four-month old preemie daughter, Madelyn, but released on October 27, 2014, after no charges were filed. A grand jury criminal indictment was subsequently filed on February 24, 2016, and both Angela and Daniel were arrested on February 26, 2016. In the indictment, Angela and Daniel were charged, in count 1, with the second degree murder of Madelyn (Pen. Code, § 187, subd. (a)).[2] Count 3 charged Daniel and Angela with felony child abuse (§ 273a, subd. (a)), with further allegations of personal infliction of great bodily injury on a child under the age of five (§ 12022.7, subd. (d)), and child endangerment resulting in the death of a minor (§ 12022.95). Angela was also charged in count 2 with assault on a child under eight years of age resulting in death (§ 273ab, subd. (a)).

Jury trial began in March 2022 and in April the jury found Angela and Daniel not guilty of murder but guilty of the lesser included offense of involuntary manslaughter (§ 192, subd. (b)). Angela and Daniel were both found guilty of count 3, felony child abuse. The count 3 child endangerment resulting in death enhancement (§ 12022.95) was found true as to both Angela and Daniel; the personal infliction of great bodily injury enhancement (§ 12022.7, subd. (d)) was found true as to Daniel, but not as to Angela. Angela was acquitted of the charges in count 2, assault on a child resulting in death.

---

[1] We refer to Angela and Daniel by their first names in order to avoid confusion; we mean no disrespect.

[2] All further statutory references are to the Penal Code unless otherwise stated.

At sentencing in June 2022, Angela was sentenced to the middle term of four years in state prison on count 3 and a consecutive four-year term for the injury enhancement under section 12022.95. The trial court stayed the punishment for the count 1 involuntary manslaughter conviction under section 654. Angela was awarded 4,516 days of custody credits, which meant she had already served her entire sentence.

On appeal Angela contends judgment must be reversed because the trial court (1) admitted irrelevant and prejudicial demographic and racial profiling evidence, which she also contends was in violation of the Racial Justice Act; (2) incorrectly instructed the jury with aiding and abetting instructions; (3) failed to sua sponte give a unanimity instruction; (4) erroneously failed to instruct that criminal intent and criminal conduct occur at the same time, and (5) erroneously admitted hearsay statements into evidence. She further contends the abstract of judgment must be corrected to omit reference to the convictions as violent or serious felonies. We agree the abstract of judgment must be corrected and in all other respects we affirm.

**STATEMENT OF THE FACTS**

_Background_

Daniel and Angela were married in 2013 and Angela became pregnant soon after. During her pregnancy, Angela developed severe preeclampsia and their daughter Madelyn was born via cesarian section in June of 2014[3], at 31 weeks gestation. At birth, Madelyn was small in size, due to intrauterine growth restriction related to Angela's preeclampsia condition, but she had a healthy Apgar score of eight and nine. Madelyn remained in the neonatal intensive care unit (NICU) for 37 days.

While in the NICU, head images, ultrasound, and X-rays showed no hemorrhaging, no undetected subdural hematoma, and no fractured ribs. She was intubated for the first day of life; premature infants have trouble breathing, occasionally

---

[3]     All further dates are for the year 2014 unless otherwise stated.

stopping for 20 to 30 seconds, needing stimulation to prompt breathing. Medication including caffeine was administered to stimulate breathing. The final episode of apnea in the NICU was documented about three weeks after Madelyn was born. NICU nurse Christine Koetsier reviewed potential breathing and behavior changes with Daniel and Angela, who verbalized that they understood.

Madelyn was sent home at the end of July, weighing just shy of four and a half pounds. Daniel and Angela were provided with printed hospital discharge instructions covering infant care, including advice to bring Madelyn to an emergency room if she stopped breathing for a period of time. The instructions explained that, if a young infant temporarily holds their breath due to reflux (called a "preemie grunt"), the baby was to be held face down and given back thrusts, three to five blows firmly between the shoulder blades. Daniel and Angela were also instructed never to shake Madelyn as head trauma can result.

Madelyn was seen for a checkup on August 8, and had gained a bit of weight. Madelyn had been wheezing, and an upper respiratory infection diagnosed, but her oxygen level was appropriate.

Madelyn was seen again on August 13. She had good weight gain, and no neurological or other abnormalities were noted. On August 29, Madelyn weighed six pounds, 12 ounces and her head shape was normal. Her hemoglobin was slightly low.

In early September, Angela attended a bridal shower and Daniel stayed home to care for Madelyn While watching television, Daniel placed Madelyn in her bouncy chair, which collapsed. Daniel reacted by bringing Madelyn close to his body and she either contacted Daniel's knee or knees with her face. Daniel sent Angela a text message and photo of the injury, stating he had "dropped her pretty good," that she had minimal crying, but she did have a red mark on her face. Angela had a text discussion with her sister about the bruise. Her sister asked if Madelyn should be taken to the doctor, but no such visit occurred.

Also, during September, Daniel and Angela made a video showing Daniel "dancing" with Madelyn — placing his hands under Madelyn armpits, which caused her shoulders to shrug. Madelyn's head pitched forward and backward as Daniel physically manipulated Madelyn's body. Daniel and Angela are heard laughing on the video recording. Neither thought Madelyn was in pain while this was happening and they did not think Madelyn was overstimulated by grabbing her leg and flipping her sideways, although acknowledging that, at this point, Madelyn was not able to hold her head up and support her neck on her own.

Angela sent this video to her sister and friends, one of whom forwarded it to Brandon Hankins, a registered nurse. Hankins knew Angela, and he called either Child Protective Services (CPS) or law enforcement and later provided the video to someone from the police department.

During the early morning hours of October 9, Daniel fed Madelyn a bottle. The room was dark as Daniel headed toward the basinet to put Madelyn down. As he was about to lay Madelyn down, Daniel lost control and dropped Madelyn into the bassinet, which made a loud enough noise to wake Angela, who asked what happened.

Daniel explained to Angela that Madelyn had fallen into the bassinet, which was padded. Madelyn cried, but recovered her composure in a few minutes. Daniel checked Madelyn's pupils for sign of concussion, and her head for any lumps, but did not notice anything that caused concern. They stayed awake and watched over Madelyn, but did not feel it necessary to take her to the emergency room. Madelyn ate and behaved normally after the incident.

On October 11, a Saturday, Daniel and Angela took Madelyn to Dr. Bryan Cruz, a pediatrician, for a medical checkup. Their concern was that Madelyn was constipated. Madelyn now weighed nine pounds. No mention was made of the earlier fall. Dr. Cruz performed a physical exam. Madelyn was alert and showed no signs of physical distress, no neurological concerns, nothing suggested traumatic head injury, and no external

5.

trauma, scrapes or swelling was observed. Because of the constipation complaint, Dr. Cruz suggested fluids and exercise, "bicycle maneuvers" of Madelyn's legs, to help with digestive issues. This involved laying Madelyn on her back and moving her legs.

Later in the day, Daniel and Angela attended a Halloween party and took Madelyn along. During the party, Madelyn fell asleep, woke up with a high pitched cry, and fell back asleep. Daniel and Angela took Madelyn home, as she appeared to have shut down as if overwhelmed or overstimulated.

When they got home, Daniel went out for 20 to 30 minutes to make an exchange at a store. The next feeding, at 10:00 p.m., was Daniel's shift, and he thought Madelyn seemed different — she was limp, and when she stopped sucking, he could not get her to start again. Daniel sat Madelyn up, but she remained limp. Daniel flipped Madelyn over and gave her 10 thrusts to her back, but her condition did not change.

Angela came into the room and Daniel asked her to get a Q-tip and he cleared Madelyn's nasal passages. While Madelyn was still nonresponsive, she was no longer limp like before. Daniel told Angela Madelyn had choked. A search history of the MacBook associated with Angela using the Safari browser at 11:00 p.m. that day, revealed an Internet cache image stating, "in loving memory," with a photo of a child.

The next feeding, which was Angela's turn, around 1:00 to 2:00 a.m., Madelyn did not wake to be fed. Daniel and Angela decided to bring Madelyn into bed with them. Her breathing went from unusually distressed to her normal wheezing.

*Madelyn is Taken to the Local Emergency Room*

On the morning of October 12, Madelyn continued to sleep and did not wake to be fed. When Daniel picked her up she felt warm with a fever. They took Madelyn's temperature, called the triage nurse, and waited for a call back. Angela then called Dr. Cruz's office and stated Madelyn had choked during the night and slept more than normal. Daniel and Angela decided to take Madelyn to the hospital.

6.

At 9:42 a.m., Angela sent a text message to her sister that they were taking Madelyn to the emergency room because her breathing was abnormal, she had been sleeping 12 hours straight, and was acting lifeless. At 9:51 a.m., Angela texted Daniel's parents that they were on their way to the emergency room because "Madelyn is acting lifeless. Please pray for her. We'll keep you guys updated." Two minutes later, Angela sent another message to Daniel's parents stating, "Let me rephrase my words. Not life less, but just sick. She ha[s] a fever." Angela's message to other friends after they arrived at the emergency room indicated Madelyn must have bumped her head somehow and they did not notice.

Andy Wong, a registered nurse, was on duty at Kaweah Delta Hospital when Madelyn arrived at the emergency room at 10:00 a.m. The initial complaint by Daniel and Angela was that Madelyn had had a choking incident around 10:00 p.m. the previous night, had been sleeping more than usual, and was not acting normal. Madelyn had a temperature of 102.8 degrees Fahrenheit, and her pulse and respiratory rate were higher than normal. Within a few minutes, after realizing Madelyn was nonresponsive, Madelyn's status was changed to urgent and a doctor summoned. Neither Daniel nor Angela told the nurse that Madelyn had stopped breathing the night before.

Emergency room physician Dr. John Hipskind examined Madelyn and found her breathing but unresponsive. The fontanel soft spot on the top of Madelyn's head was bulging, indicating increased intracranial pressure due to swelling in the skull. Madelyn's pupils were dilated, another symptom of increased intra cranial pressure. Madelyn was intubated and hooked to a breathing machine. A CAT scan revealed a left occipital skull fracture, diffused cerebral edema, left subdural hematoma, and transtentorial herniation.

Radiologist Dr. Glade Roper was unable to differentiate between the gray and white matter on an X-ray of Madelyn's head, indicating her brain was severely injured

and swollen. Dr. Roper opined that Madelyn's skull was fractured into the occipital bone, and the images indicated Madelyn suffered blunt trauma to the head.

Dr. Hipskind found the history provided by Daniel — about the fall from a short distance during feeding four nights previous — as inconsistent with the severity of Madelyn's injuries. He also opined that the delay of eight or nine hours between symptom onset and seeking medical treatment, raised the question of nonaccidental trauma. Dr. Hipskind decided to transfer Madelyn, who was in critical condition and at risk of dying, to Valley Children's Hospital, where she was helicoptered at approximately 1:45 p.m.

*Madelyn is Transferred to Valley Children's Hospital*

Daniel and Angela were driven to Valley Children's Hospital by Daniel's parents. Enroute, at 2:17 p.m. Angela texted a friend that Madelyn "[s]omehow she must have hit her head," but had "[n]o idea when it happened." At 2:24 p.m., Angela's MacBook was accessed to search for funerals, burials, obituaries, and "newborn infant's obituary."

Madelyn arrived at Valley Children's Hospital unconscious and was examined by Dr. Thianchai Bunnalai, a pediatric intensive care physician. Daniel told Dr. Bunnalai that Madelyn had been dropped into a bassinet on October 9, a fall of around one and one-half feet, and that she experienced a choking incident and was not breathing well on October 11. He did not mention that Madelyn had stopped breathing. After Dr. Bunnalai spoke to "another person," he went back to talk to Daniel again, who then acknowledged Madelyn had stopped breathing.

At 5:21 p.m., Angela texted Lorene that "Daniel accidentally dropped Madelyn like four days ago." Angela also texted Veronica that Madelyn "isn't going to make it. Daniel dropped her four days ago," and although Madelyn had seemed fine then, she was not.

Dr. Bunnalai called a neurologist, pediatric neurosurgeon Dr. Ashely Tian, and a pediatric trauma surgeon for assistance, as Madelyn's clinical picture of blunt trauma to

8.

the head and brain swelling was not explained by the short fall Daniel described.  Dr. Tian noted a full nonaccidental trauma workup was required, and Dr. Bunnalai called child abuse specialist, Dr. Philip Hyden.

Dr. Hyden noted that Madelyn did not react to touch and her eyes did not respond to light or stimulus.  Dr. Hyden saw no signs of external trauma, but Madelyn's fontanel was protruding upwards.  Dr. Hyden recommended a full skeletal survey to check for other fractures, as well as an ophthalmology evaluation.

Ophthalmologist Dr. Mehdi Ghajarnia examined Madelyn  Classic indicators of a nonaccidental trauma are multilayered hemorrhage in the retina, as are extensive hemorrhages.  Dr. Ghajarnia found a few intraretinal hemorrhages in Madelyn  Dr. Ghajarnia found the limited finding suspicious but not conclusive.  Dr. Ghajarnia opined that Madelyn was less likely the victim of shaken baby trauma as opposed to impact trauma, but could not conclude with absolute certainty that Madelyn was not subjected to nonaccidental trauma, or classic shaken baby syndrome, causing the limited retinal bleeding he saw.

Radiologist Dr. Michael Myracle performed an MRI on Madelyn's brain and spine, which was read by pediatric radiologist Dr. Fred Laningham.  The images showed Madelyn's brain to be very swollen with poor blood flow.  Dr. Laningham opined that the injury occurred within the past three days.

Dr. Myracle could not exclude the possibility that the subdural hematoma was several days old.  Dr. Myracle opined that it would be reasonable to assume that the skull fracture and brain injury were caused simultaneously.

Dr. Myracle also did a chest X-ray of Madelyn and found several rib fractures, which Dr. Myracle opined had occurred a minimum of 10 days prior to examination and could have occurred at the same time, or could have involved up to three separate events.

Dr. Myracle and Dr. Laningham also found evidence of corner fractures or bucket-handle fractures, which are classic "metaphyseal lesion[s] of child abuse."  Dr. Myracle

9.

found corner fractures on both sides of Madelyn's knee joints, thigh bones, and shin bones. The most likely mechanism for knee fractures would be to grab the lower legs and move the knees forcefully. Dr. Myracle thought there was probably another fracture on one of the ankles, but was not certain, citing the presence of periosteal healing.

Medical experts at Valley Children's Hospital decided surgery would be futile, due to Madelyn's extensive injuries. Her brain tissue was swollen to the extent that it pushed down through the brain stem, which compressed the respiratory center and stopped breathing. Compression also stopped blood circulation.

*Madelyn's Death and Autopsies*

Madelyn was pronounced dead on October 16 at 12:44 p.m. after life support was removed. An initial autopsy of Madelyn was conducted on October 20 by Dr. Walter. Robert Douglas, an identification technologist, was present at the autopsy and observed that, when Madelyn's head was opened, there was visible blood inside. A second pathologist, Dr. Evan Matshes, was later consulted after Dr. Walter passed away.

Dr. Matshes had concerns about the conclusions drawn from Dr. Walter's autopsy. While Dr. Walter had concluded there were no rib fractures, Dr. Matshes viewed the photos of Madelyn's ribs and found three healing rib fractures. Because the original microscopic slides, tissues harvested during autopsy used to make those slides, and the autopsy X-rays had been inadvertently destroyed, Madelyn's remains were exhumed for a second autopsy.

The second autopsy was performed on January 21, 2022, by Dr. Matshes and Dr. Madeleine Hinkes, a forensic anthropologist. The two healing rib fractures towards the back of the right side of Madelyn's body, observed from the 2014 photos, were not able to be confirmed during the second autopsy due to the degraded bones. Medical evidence made Dr. Matshes highly suspicious of corner fractures, but he could not confirm them since the remains were too degraded. Prior images, however, were suggestive of corner fractures and were concerning, as they are a strong indicator of child abuse.

10.

Dr. Matshes determined Madelyn died from blunt force head trauma. While Dr. Matshes could not rule out the possibility that Madelyn's bassinet fall caused her brain injury, it was not likely.

Dr. Matshes concluded that Madelyn's subdural hematoma evolved over time, as documented by the CAT scan and initial autopsy. Madelyn suffered at least one traumatic episode and, based on other injuries, Dr. Matshes could not rule out two or three distinct episodes. Dr. Matshes described the video of Madelyn being manipulated (dancing) as very rough handling, and could not rule out that this caused some of Madelyn's injuries. Dr. Matshes did not find evidence of a skull fracture, but could not rule it out entirely due to the condition of the remains.

Dr. Myracle was aware of the disputed finding of skull fracture from the second autopsy, but had no doubt about his diagnosis of a skull fracture. He believed the subdural hematoma and herniating of the brain caused Madelyn's death.

*Child Abuse Expert*

Dr. Hyden spoke to Daniel on October 14, and was told that, on October 9, Daniel dropped Madelyn into her bassinet from one and one-half feet, heard a noise, and thought Madelyn struck her head on the bassinet. Daniel picked Madelyn up, she cried briefly, was consoled and appeared fine. Dr. Hyden was told Madelyn stopped breathing the night before she was taken to the hospital on October 12. When Madelyn stopped breathing, Daniel had administered 10 blows to Madelyn's back.

Dr. Hyden opined that it was significant that Madelyn's fractures were healing because it takes several days to see nondisplaced rib fractures on X-rays, and an injury cannot be seen until new bone has formed around the fracture. Dr. Hyden opined that all of Madelyn's rib fractures were 10 to 14 days old, and another fractured rib may have been older. Dr. Hyden had never seen rib fractures caused by back thrusts or blows, as described by Daniel.

11.

The metaphysical fractures to both Madelyn's knees and one of her ankles were concerning to Dr. Hyden, as they are caused by grasping the bone and pulling or jerking, inconsistent with normal handling and could have been caused by the "bicycling" activity described by Daniel, which Dr. Hyden described as reckless and dangerous. Dr. Hyden reviewed the video of Daniel "dancing" with Madelyn and described the activity as "reckless" with "no regard" for Madelyn's safety.

Because of the inconsistencies in Daniel's version of the events, Dr. Hyden did not believe Daniel. Dr. Hyden noted that, while Daniel said he dropped Madelyn into her bassinet, there was a video recording demonstrating how Daniel hit the wall while holding Madelyn and she then fell into the bassinet. Dr. Hyden did not believe a skull fracture like Madelyn's could result without someone being violent to her head, and the skull fracture and corner fractures pointed to child abuse.

Dr. Hyden opined that a subdural hematoma could occur without a skull fracture, and that the subdural hematoma was likely caused by vigorous shaking. Dr. Hyden did not believe a simple fall into the bassinet could cause the subdural hematoma and traumatic brain injury in this case. Dr. Hyden opined that, if Madelyn was a little fussy before the nonbreathing event on Saturday, then the head trauma happened shortly beforehand. If Madelyn's injury was caused by the drop into the bassinet, she would not have been able to feed normally as reported for the few days following. Dr. Hyden believed the fatal head injury occurred just before Madelyn became lifeless in appearance.

Dr. Hyden's opinion that Madelyn was battered would not change even if there was no skull fracture, as she died of major brain trauma. Dr. Hyden concluded that Madelyn suffered from an "accelerated/decelerated shaking event with a slam that caused vessels to be ruptured to cause the inside of the brain to become diffused." Dr. Hyden opined that Madelyn suffered from abusive nonaccidental head trauma.

12.

Pediatrician and child abuse specialist Dr. Frederic Bruhn was consulted on Madelyn's case. He watched the video reenactment in which Daniel demonstrated the back blows he gave Madelyn and his dropping Madelyn into the bassinet, and he watched the video of Daniel "dancing" with Madelyn Dr. Bruhn observed the September 7 photo of Madelyn's bruise under her left eye, the explanation for which was that Madelyn fell out of a chair. Dr. Bruhn opined that, had he seen the eye, he would have performed an investigation into abuse, as two-month-olds do not usually have black eyes. Dr. Bruhn opined that some of the actions in the "dancing" video could have caused the corner fractures. Dr. Bruhn was even more concerned about Daniel's demonstration of "bicycling."

According to Dr. Bruhn, when a subdural hematoma occurs, a baby will often stop breathing and that is when the damage is done. While the initial history was that Madelyn slipped out of Daniel's hands three to four days before she arrived at the hospital, that did not explain her condition when she did arrive. In addition, the history of choking did not explain the head injury. And, according to Dr. Bruhn, back thrusts do not produce skull fractures and brain injury. Dr. Bruhn also did not think that the rib fractures were caused by the back blows.

Dr. Bruhn opined that it would be very unusual for a short fall to result in serious brain injury to a child, and the fall, as described, would not have resulted in severe head injury and Madelyn would not have acted well if that had been the case. Dr. Bruhn was aware of Dr. Tian's thought that Madelyn's subdural hematoma was likely caused by the fall into the bassinet.

Dr. Bruhn opined that Madelyn's brain injury likely happened around 10:00 p.m., the night before she was taken to the emergency room. According to Dr. Bruhn, Madelyn should have been taken to the emergency room immediately, and most parents would do so without delay if the child stopped breathing for two to three minutes. Dr. Bruhn did

13.

not think any treatment Madelyn received at the hospital contributed to her death, and nothing could have been done to save her by the time she arrived at the hospital.

*Child Abuse Investigation*

On October 12, Police Officer Joshua Pena contacted Brandon Hankins, who had sent the "dancing" video by e-mail to Officer Pena. After he spoke to nurse Hankins, Officer Pena went to Valley Children's Hospital to interview Angela and Daniel. Both agreed to talk to Officer Pena. Officer Pena interviewed Angela first and then Daniel.

The audio recording of Officer Pena's interview with Angela was played for the jury. In it, Angela described the fall into the bassinet on Wednesday or Thursday night, that Madelyn cried for two minutes, seemed fine, and went back to sleep. The day before, October 11, Madelyn was taken to the emergency room and seen by a doctor with a complaint of gas and constipation. Madelyn was examined and found not to have any injury. That night, Madelyn did not want her bottle. Her breathing between 10:00 p.m. and 4:00 a.m. sounded as if she had phlegm in her throat, which Angela described as a "preemie grunt."

Angela thought that because Madelyn was a preemie, she had been overstimulated during the day, and that that, along with her excessive crying and being in pain from gas, caused Madelyn's body to shut down and sleep. At 4:00 a.m., when Madelyn flailed her arms, Angela assumed she was hungry and prepared a bottle, but Madelyn would not take it. Angela and Daniel stayed awake to watch Madelyn and became concerned when she continued to sleep and developed a fever. The following morning, Madelyn was "lifeless, not moving and she slept 12 hours." Her temperature was 100 degrees in the morning.

The audio recording of Officer Pena's interview with Daniel was also played for the jury. In it, Daniel described the incident when he accidently fumbled while putting Madelyn into her bassinet, dropping her as it was too dark to see. Madelyn cried for a few minutes, they checked her for injuries, and she seemed fine and acted normal for the

next two days. However, according to Daniel, Madelyn started "acting weird" on October 11 and they took her to the doctor thinking she was in pain due to intestinal gas. But the results of the examination were that she was fine.

Daniel and Angela took Madelyn to a Halloween party at 4:00 p.m. and she seemed fine. When she started to cry, they took her home. At 7:00 p.m., thinking she was struggling with gas, Daniel did "baby yoga" with her and she finished a bottle he gave her. According to Daniel, at the 10:00 p.m. feeding "kind of the same thing happened," and mid-feeing, Madelyn went "lifeless" and was not breathing. Daniel turned her around and gave her back thrusts, but she still was not breathing. She resumed breathing after Daniel swabbed her nostrils. Daniel thought Madelyn had not been breathing for two or three minutes.

Daniel stated they did not take her to the hospital at that time because she had had an episode "exactly like this" three to four weeks earlier and the doctor had said it was a "preemie thing" and normal for them to stop and then restart breathing. When Madelyn's breathing became more normal, Angela and Daniel assumed she was feeling better. The decision to take Madelyn to the emergency room was made after "it went … on too long," and she had been sleeping for 12 hours and her body temperature had risen rapidly.

Officer Pena thought it significant that Daniel had said Madelyn stopped breathing for two or three minutes, which seemed a long time, and he relayed this information to Dr. Bunnalai. Dr. Bunnalai then recontacted Daniel and Angela to find out why the information about Madelyn not breathing had been omitted, which Daniel subsequently confirmed.

At 9:33 p.m. on October 12, Angela texted Lorene that they were being investigated by "CPS police officers." She sent the same text to Sabrina Quair. Two minutes later, Angela texted her sister April that Daniel's father was angry because they

had not mentioned that Madelyn had been dropped and he asked whether they were certain they never did "anything else to her."

Officer Pena returned to Valley Children's Hospital on October 15 for further investigation. Both Angela and Daniel were there, and Officer Pena asked that each write a timeline of events from October 8 through the present. Angela's timeline stated that Madelyn stopped eating on Saturday, October 11, between 9:00 and 10:00 p.m. and they figured she was "overstimulated." When it was time to feed her at 4:00 a.m. the next morning, Madelyn was awake but would not eat. She woke Daniel and told him "Madelyn seemed a little weird." They thought she must be exhausted and decided to let her rest. They did an Internet search and concluded it was a viral infection or pneumonia. Angela called the NICU at around 10:00 a.m., but ultimately they decided to take Madelyn to the emergency room. Angela also described an earlier breathing incident and thought it was normal for a premature infant, but they eventually called the NICU.

Daniel's timeline described Madelyn not breathing and giving her back thrusts and clearing her nasal passage. Daniel stated that this had happened before and were told preemie babies sometimes have these episodes and "kind of shut off for a few hours and have irregular breathing during that time." Daniel explained that, although they were told it was normal, they were concerned and took Madelyn to the doctor the following day where she was examined, found to be normal, and sent home. On October 11, they believed Madelyn was having another episode and watched her closely, but after eight hours, thought it might be pneumonia and decided to take her to the emergency room.

Officer Pena next contacted Daniel and Angela October 22. They came to the police station at Officer Pena's request and interviews were again recorded and played for the jury.

Daniel again described the earlier episode of not breathing, after which Madelyn was examined by a doctor and told not to worry. He assumed the event of October 11 was a similar episode.

16.

Another video was taken of Daniel reenacting (with a doll) his bicycle exercise with Madelyn and demonstrating the back thrusts he used on Madelyn  Angela watched the video of Daniel demonstrating the bicycling, but said she never saw Daniel move Madelyn's legs that fast.

In her interview, Angela stated that she had postpartum anxiety and experienced panic attacks.  She was seeing obstetrician and gynecologist Dr. Elizabeth Enderton for help.  Angela and Daniel did not say anything to Dr. Cruz about the fall into the bassinet because Madelyn seemed fine after the incident.  Angela believed Madelyn's injuries were due to the fall into the bassinet, which she was assured was an accident, and they should have taken her to the emergency room at that time.

Angela stated that she did not see Madelyn stop breathing Saturday night, but was told by Daniel it had been for a couple of minutes and he administered back thrusts.  He asked her to go get some Q-tips to help clear Madelyn's throat.  She then said Daniel had told her Madelyn had choked, but did not mention Madelyn not breathing.  Angela recalled that Madelyn had stopped breathing a couple of weeks after they brought her home.  They took her to the doctor's office, but were told it was normal for premature infants to have interrupted breathing.  Angela stated that she and Daniel did not take Madelyn to the doctor right away after the last episode because they believed she was exhibiting normal behavior for premature infants.

*Defense*

Ophthalmologist Dr. Mehdi Ghajarnia, who worked at the California Eye Institute, was consulted to look for retinal hemorrhaging in Madelyn on October 12.  Multilayered retinal hemorrhaging is a classic sign of nonaccidental trauma.  When Dr. Ghajarnia examined Madelyn, she had "limited intraretinal hemorrhages."

Dr. Enderton testified that Angela attended all her prenatal appointments.  She suffered from severe preeclampsia, which required early delivery at 31 weeks.  According to Dr. Enderton, a fetus's lungs are the last of the body functions to develop

17.

and breathing was a concern for premature infants. Dr. Enderton testified that postpartum depression manifests itself in the first six weeks after delivery and includes symptoms of feeling hopeless, not being able to care for oneself, excessive sleeping, and either eating too much or not at all. Dr. Enderton saw Angela on July 10, talked to her about postpartum depression and referred her to a social worker.

Clinical psychologist Brandon Foster saw Angela on August 14. At the time, Angela reported anxiety and catastrophic thoughts, and had excessive worries. Dr. Foster testified that Angela had good judgment, her thought processes were intact, and she had low aggression and high anger control. Dr. Foster's notes stated, "current suicidality vague, no plans, or intent." Dr. Foster had no concern about Angela's impulse control.

Dr. Foster saw Angela on August 21 for anxiety. At the time she had minimal depression, her agitation and aggression were long and her control was high. Angela did not come to an August 28 appointment, called to say she was feeling better and did not reschedule.

*Daniel's Testimony*

Daniel testified that, at some point in Angela's pregnancy, he quit his job since she needed constant care due to preeclampsia. Daniel testified she was at "high risk for a heart attack or stroke." Daniel explained that they moved in with his parents because their apartment had an issue with second-hand smoke and other noxious odors that gave him headaches.

Daniel testified that doctors determined that Angela would need a cesarean section early or it would result in the death of the child. After Madelyn came home from the NICU, Daniel talked to doctors and nurses about "bicycling," which he described as moving Madelyn's legs and moving her legs "knees-to-chest" to "alleviate gas." Daniel testified that Madelyn had an "apnea episode" while in the NICU, which Daniel claimed the hospital told them "was normal," and she would have episodes where she might stop breathing for a "few seconds." Daniel recalled such an episode a week after they brought

18.

Madelyn home. He described the episode as her "shutting down" but it did not involve "any non-breathing."

Daniel described the video of him "dancing" with Madelyn as something seen on America's Funniest Home Videos. Daniel described having fun with Madelyn and Angela, who was holding the camera.

As for the incident in which Madelyn fell against his knee, Daniel testified that was the first time he watched Madelyn by himself for a significant amount of time. He was watching television and Madelyn was in her bouncy chair next to him. When he tried to lift Madelyn from the chair, it collapsed in on itself. He then brought Madelyn's body close to his and she received a "little mark on her eye" which developed into a bruise the next day. It was gone the day following.

Daniel testified that during Madelyn's three-and-a half month life, they took her to the doctor six times, each time with gastrointestinal issues. Each time they were told Madelyn's "liveliness" would eventually come. Daniel acknowledged that they had been told of a "vast list of problems associated with preemies and when you should bring them into the ER."

Daniel described Madelyn's "drop in the bassinet" as occurring during a feeding with Madelyn. He described getting up to put Madelyn in her bassinet after swaddling her. The room was dark. He had her on his right shoulder and started to put her down before she was near the bassinet and ended up "fumbling her" a split second where he lost control. Madelyn landed in the bassinet, and he picked her up "quickly." She cried for a few minutes and then stopped. Daniel described the event as "alarming," but not something he would rush off to the emergency room for. Daniel and Angela paid attention to Madelyn the remainder of the night. She was awake often, but Daniel did not see her pupils dilated or constricting and there was no lump on her head.

Daniel described giving Madelyn "back blows" on October 11. He was feeding Madelyn and she went limp. He turned her around and laid her across his leg and gave

19.

her 10 back blows "with some force." When Angela came into the room, he asked her for Q-tips to swab her nose. Daniel was not sure Madelyn was not breathing during the two- to three-minute episode and insisted that he never said in "any of the interrogations" that she was not breathing, only that it appeared like it. Daniel and Angela continued to check on Madelyn and she seemed to be better. But Daniel described Madelyn as being "shut down," longer than the two previous episodes and she would not wake to be fed. Her temperature appeared normal at first, but went up. Angela called the NICU but was told not to bring her in yet. But after checking her temperature again, they decided to take her to the emergency room.

*Angela's Testimony*

Angela testified that she was elated when she got pregnant, but began suffering from nausea about a month into the pregnancy. She had severe migraine headaches, which felt like a hammer hitting her head. Her body was swollen and was put on a magnesium strip to prevent a stroke or seizure. Angela was sick after Madelyn was delivered by cesarean section. Her blood pressure was so high she could not leave her hospital room and she was not able to see Madelyn for three or four days. Angela felt detached from Madelyn when she was born, and this feeling persisted until Madelyn was released from the NICU.

Angela's depression lifted when Madelyn was discharged, but she experienced anxiety about a week or two later. She had read about women who thought their child was Satan, and she did not want to end up like that. She developed irrational fears and imagined babies being cooked in microwaves and stoves. Angela told her health care providers about her anxiety. Zoloft was prescribed but increased her anxiety. When the dosage was adjusted, her anxiety remained, but her irrational fears went away. She still occasionally had a panic attack and difficulty sleeping, but there was never a time when she could not provide for Madelyn. Angela testified that Daniel would never hurt Madelyn.

20.

Angela did not believe there was anything wrong with Madelyn when they were getting ready for the Halloween party on October 11. Madelyn did not eat after the party, but Angela thought she had been overstimulated. Madelyn did not appear to be in distress when Daniel asked her to retrieve the Q-tips. The next morning, Madelyn appeared to be sleeping and Angela thought she was okay. Angela went outside with the dog for a few minutes and when she came inside she picked Madelyn up. She was warm and Angela and Daniel decided to take her to the emergency room. While at the hospital, Angela thought the only possible explanation for Madelyn's injuries was the bassinet fall. Daniel had not yet said anything to her about Madelyn not breathing.

## DISCUSSION

I.  DID THE TRIAL COURT ABUSE ITS DISCRETION IN ALLOWING IRRELEVANT AND PREJUDICIAL DEMOGRAPHIC AND RACIAL PROFILING EVIDENCE? DID THE TESTIMONY VIOLATE THE RACIAL JUSTICE ACT?

Angela argues that the trial court abused its discretion by allowing Dr. Frederic Bruhn, a board certified pediatrician and child abuse specialist, to testify about the risk factors for child abuse, asserting this was profiling evidence and should have been excluded under Evidence Code, sections 350 and 352. In supplemental briefing, Angela argues the testimony also violates the Racial Justice Act (§ 745). We find no prejudicial error.

*Procedural History*

Angela filed a motion in limine to exclude Dr. Bruhn from testifying that premature babies who are not breastfed are at greater risk of abuse; that Angela was at risk of being an abuser because she herself had been abused; that Angela was not bonded with Madelyn because Madelyn was premature; or that Madelyn had been abused because she was crying. At the hearing on the motion, the prosecutor agreed not to elicit testimony from any expert about breast feeding or that premature babies were more at risk for abuse.

21.

*Dr. Bruhn's Testimony*

At trial, Dr. Bruhn testified as an expert in pediatric child abuse. He reviewed Madelyn's medical records and the investigative police reports. According to Dr. Bruhn, Madelyn's medical history before her October 12 emergency room admission was not concerning, but in his opinion, there was nothing the hospital could have done to save Madelyn's life when she was admitted.

Dr. Bruhn testified that Madelyn's skull fracture must have been caused by a high degree of force, and could not be explained by the parents' story about Madelyn's choking episode the night before she was admitted. Dr. Bruhn opined that it would be very unusual for Madelyn's earlier short fall into her bassinet three days before admission to have resulted in serious brain injury or death.

Dr. Bruhn described Madelyn's rib fractures as "highly specific for abuse" and could not have been caused by Daniel's description of giving her back thrusts the previous night. Dr. Bruhn also described Madelyn's corner fractures on her legs as highly specific for abuse. Dr. Bruhn opined they could have been caused by Daniel's manipulation of Madelyn's legs in the way he demonstrated for the police, or by "dancing" with her as seen in the video, although he acknowledged there was disagreement among the experts about the dancing. Dr. Bruhn testified that the skull fracture and rib fractures were inflicted intentionally, but he was not certain whether the corner fractures were intentional or accidental. According to Dr. Bruhn, Madelyn's head injuries could not have been sustained by the alleged fall into the bassinet, as she would have been symptomatic much earlier and would not have been able to feed normally. Madelyn would have had a lucid period of "[m]inutes to maybe hours" — not days — between sustaining her fatal injury and falling unconscious.

On cross-examination, Daniel's counsel asked several questions about whether certain risk-factors for child abuse applied, such as offering contradictory explanations, shifting blame to other people, or delaying care.

22.

On further redirect, the prosecutor noted that Dr. Bruhn was asked "about a number of risk factors that may not have applied in this case," and was asked "Did you identify certain risk factors that did apply to this case and were significant to your analyzation?" Dr. Bruhn replied, "Yes," and Angela's counsel then objected, stating that the trial court had made a ruling on this.

Outside the presence of the jury, the prosecutor explained that the court had previously excluded prosecution experts from testifying about profile-type risk factors that did apply, but that Daniel's attorney had opened the door by inquiring about risk factors that did not apply. The trial court then asked Dr. Bruhn how he would answer the following question: "What would be the risk factors that you would associate with child abuse[?]" Dr. Bruhn explained, "There's risk factors before the event and after the event." When asked what those were, Dr. Bruhn stated that before the event "they are like social economic." As for after the fact risk factors, Dr. Bruhn cited the story not fitting the injuries, delay in seeking care, and multi-organ injuries. The court observed all of those issues had already been testified to, and ruled that Dr. Bruhn could testify to those factors. Dr. Bruhn further identified premature babies, lack of attachment, isolation, and an unemployed father as further risk factors. The trial court allowed Dr. Bruhn to testify to those factors over Angela's counsel's objection.

Dr. Bruhn's testimony then resumed before the jury.

"[Prosecutor] Q. Doctor, you said there are risk factors, and I know risk factors aren't diagnostic, but there were some risk factors that you believed were pertinent to this case?

"A. Yeah. And I -- the reason I stayed away was I had received instructions not to talk about risk factors.

"Q. Well, I am asking about them now, and you are permitted to discuss that.

"A. And again, I don't think they sway me one way or the other, because there's nothing that gives you the litmus test. But there are certain

23.

patterns that are available from people who are knowledgeable and dealt with a lot of child abuse. And I divide factors before the event that lead up to the event, and there's a whole list of them. Socioeconomic, and racial, and I think that's why people stay away from those things. But it is true.

"Q. Is a caregiver being unemployed something that increases the risk that their children can be --

"A. Unemployed, isolated, drugs, alcohol.

"Q. When you say isolation, are you referring to isolating the child from, like, other family members or outsiders?

"A. They just don't have support systems. They don't -- now here, I don't know. They were living with their the [*sic*] father's -- the grandparents, but I'm not sure of all the specifics. You can live with somebody and be isolated from them. [¶] So the big one in this case was the prematurity and being cooped up in a nursery. There's a lot of work -- and I'm not an expert in it, but I'm aware of the work, and that is attachment disorders. And that's talked about all the time, that the baby doesn't attach as normally as if he or she was out and had a normal birth and delivery at home in a day and that sort of thing.

"Q. Is there -- within your field, is there any literature or studies supporting that babies who are separated from their parents in the NICU for any length of time, have higher incidents statistically of being abused?

"A. Yeah. But it is not 100 percent. It is not all or none. It is a tendency, that babies that spend longer time in the NICU have a higher risk of being -- having attachment problems. [¶] But certainly, you can have a baby that's at risk and doesn't develop attachment problems and vice versa. You can have babies that go home right away and have development attachment problems. It is not as firm as some of the medical stuff that we rely on.

"Q. Thank you. There was some questions about risk factors that may not have applied. I wanted to clarify if you felt that there were some that actually did apply in this case?

"A. No."

*Applicable Law and Analysis*

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to

which his testimony relates." (Evid. Code, § 720, subd. (a).) Similarly, Evidence Code section 801, subdivision (a) permits the introduction of opinion testimony by a qualified expert on a subject sufficiently beyond common experience when the opinion would assist the trier of fact. In addition, evidence is generally admissible if it is relevant. (Evid. Code, § 351.) Relevant evidence is that which has a tendency to prove or disprove a disputed fact that is of consequence to the determination of the action, including the credibility of a witness. (Evid. Code, § 210.)

The trial court has discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) A trial court's decision to admit evidence is reviewed for an abuse of discretion. (*People v. Brooks* (2017) 3 Cal.5th 1, 43.) An appellate court cannot reverse a judgment based on the erroneous admission of evidence unless the admitted evidence "resulted in a miscarriage of justice." (Evid. Code, § 353, subd. (b).)

As argued by Angela, "Dr. Bruhn testified the following factors increased the probability the defendants abused [Madelyn]: (1) their socioeconomic status; (2) their racial status; (3) the fact that [Madelyn] was premature; (4) the fact Daniel was unemployed; and (5) the defendants isolated [Madelyn] from other family members." In doing so, Angela contends the trial court abused its discretion and violated her right to due process and equal protection of the law in allowing the prosecutor to elicit testimony from Dr. Bruhn on the risk factors for child abuse.

Whether or not, as respondent argues, defense counsel opened the door to Dr. Bruhn's questioning, we find any error in admitting the testimony Angela objects to harmless. "Ordinarily, the erroneous admission of evidence is reviewed for prejudice under the standard described in *People v. Watson* (1956) 46 Cal.2d 818 …, which requires reversal only if the defense shows it is reasonably probable that a result more

25.

favorable to the appealing party would have been reached in the absence of the error." (*People v. Roberts* (2017) 13 Cal.App.5th 565, 576.) "However, when the error involves a defendant's federal constitutional rights ..., the error is reviewed for prejudice under the standard described in *Chapman v. California* (1967) 386 U.S. 18, 24," which asks a reviewing court to evaluate whether it can say beyond a reasonable doubt that the erroneous admission of evidence did not contribute to the jury's guilty verdict. (*Roberts*, at pp. 576−577.)

Dr. Bruhn's testimony was not lengthy, and did not imply that Angela and Daniel were child abusers because they fit a profile. While Dr. Bruhn did testify that prematurity, isolation, and caregiver unemployment could be risk factors for child abuse, his testimony was general and qualified. Dr. Bruhn made it clear that he was "not sure of the specifics" of Angela and Daniel's living situation prior to their arrest. He also testified that, while babies who are in the NICU for a long period of time are more likely to develop attachment problems, "it is not 100 percent. It is not all or none." Specifically, when the prosecutor asked Dr. Bruhn if he felt there were some risk factors that actually did apply in this case, Dr. Bruhn answered, "No." And most significantly, Dr. Bruhn never testified that either Angela or Daniel fit the "profile" of a child abuser, or that they were more likely to commit child abuse based on their demographic or personal characteristics.

The above testimony aside, compelling evidence of child abuse was substantial. Both child abuse experts testified that the nature, severity, and frequency of Madelyn's injuries were highly indicative of child abuse. The evidence before the jury included multiple leg fractures, a severe head injury, and older rib fractures to Madelyn, all suggesting multiple separate instances of severe nonaccidental trauma. This was not a case about, as Angela alleges, parents who were faced with a difficult medical decision and made the wrong call. This was a case of an infant with multiple traumatic injuries, evidence of reckless behavior (dropping Madelyn into a bassinet, "dancing" with her as

26.

seen in the video), and a fatal head injury that went untreated for a substantial amount of time. The evidence of guilt was overwhelming and it is beyond a reasonable doubt that the admission of the complained of testimony contributed to the verdict, under either *Watson* or *Chapman*.

<u>Racial Justice Act</u>

In supplemental briefing, Angela contends judgment should be reversed because the prosecution's evidence that race was a factor for the likelihood of child abuse violated the Racial Justice Act.

Effective January 1, 2021, the Racial Justice Act codified the fundamental principle that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) According to Angela, the prosecutor in this case violated the Racial Justice Act by allowing Dr. Bruhn to testify that race was a factor for the likelihood of child abuse. Respondent concedes that the Racial Justice Act applies retroactively to Angela's case because it is not yet final but asserts Angela's challenge cannot be raised on direct appeal and is otherwise without merit. We reach and reject Angela's claim.

As is relevant here, a violation of the Racial Justice Act is established if the defendant proves, by a preponderance of the evidence that "[d]uring the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, *an expert witness*, or juror, *used racially discriminatory language about the defendant's race, ethnicity, or national origin*, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." (§ 745, subd. (a)(2), italics added.) For purposes of the Racial Justice Act, " 'Racially discriminatory language' " is defined to mean "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language." (§ 745, subd. (h)(4), italics added.) The burden is on the defendant to prove a Racial Justice Act

27.

violation. As stated above, however, the defendant need not establish intentional discrimination. (§ 745, subd. (c)(2).) After a judgment has been entered, if the court finds that a conviction was sought or obtained in violation of the Racial Justice Act, the court "shall vacate the conviction and sentence, find that it is legally invalid, and order new proceedings consistent with" the Racial Justice Act. (§ 745, subd. (e)(2)(A).)

The Racial Justice Act provides that "[a] defendant may file a motion in the trial court or, if judgment has been imposed, may file a petition for writ of habeas corpus or a motion under section 1473 [if out of custody] in a court of competent jurisdiction, alleging a violation of subdivision (a)." (§ 745, subd. (b).) As originally enacted, the Racial Justice Act stated that it applied "only prospectively in cases in which judgment has not been entered prior to January 1, 2021." (Former § 745, subd. (j).) Here, Angela's trial took place in March and April of 2022, and she was sentenced on June 10, 2022. Thus, Angela could have filed a Racial Justice Act motion with the sentencing court or included a Racial Justice Act claim in the petition for habeas corpus she filed in connection with this direct appeal. Respondent argues that these options—trial court motion or petition for habeas corpus—are the exclusive means for raising a Racial Justice Act claim, and thus we should not consider the issue for the first time on direct appeal, noting that "appellate courts are not equipped to accept new evidence and make factual findings" (quoting *People v. Cervantes* (2020) 46 Cal.App.5th 213, 224).

Under the circumstances of this case, however, we will reach Angela's Racial Justice Act claim on the merits. Preliminarily, we recognize the gravity of Racial Justice Act claims and the importance of their timely resolution. However, among the issues raised in this appeal, we have already considered, above, Angela's challenge to the very same language she now contends constitutes a violation of the Racial Justice Act. Specifically, we have rejected Angela's claim that the trial court erred when it allowed Dr. Bruhn to testify as he did. Unlike certain Racial Justice Act challenges, our review of the issue raised is based on undisputed facts, and no further factfinding is necessary. We

28.

will therefore proceed on the assumption that, under the circumstances of this case, we can consider Angela's Racial Justice Act claim in this appeal.

Angela claims Dr. Bruhn's testimony that "socioeconomic and racial" factors increase the likelihood that someone would abuse a child is impermissible under the Racial Justice Act. According to Angela, who is Hispanic, the admission of this evidence "increased the likelihood that she abused Madelyn" However, as stated above, Dr. Bruhn's testimony did not suggest that Angela was more likely to be guilty because of her race. Although he testified that some risk factors for child abuse were "[s]ocioeconomic and racial" while giving general background information, he clearly stated that he did not include any risk factors in his analysis.[4] As argued by respondent, Dr. Bruhn "did not testify that any particular race was more likely to be engaged in child abuse, let alone that [Angela] was likely guilty due to her race or ethnicity."

We agree with respondent, seeing no Racial Justice Act violation on these facts. As stated above, it is improper under the Racial Justice Act for various trial participants, including expert witnesses, to use "racially discriminatory language about the defendant's race, ethnicity, or national origin." (§ 745, subd. (a)(2).) Such language includes "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, ... language that compares the defendant to an animal." (*Id.*, subd. (h)(4).) But we do not perceive Dr. Bruhn's testimony to be racially laden and, without more, does not indicate racial animus sufficient to support a violation of the Racial Justice Act. We reject Angela's claim to the contrary.

---

**4** Question: "I wanted to clarify if you felt that there were some [risk factors] that actually did apply in this case?" Answer: "No."

29.

## II.    JURY INSTRUCTIONS

Angela raises a number of challenges to the jury instructions as given. Angela and Daniel were both charged with second degree murder in the death of Madelyn. Instructions on involuntary manslaughter and aiding and abetting were given.

Both Angela and Daniel were acquitted of the second degree murder charge, but found guilty of the lesser offense of involuntary manslaughter.  In addition, Angela was found not guilty as charged in count 2 of assault on a child causing death (§ 273ab, subd. (a)).  In count 3, both Angela and Daniel were found guilty of child abuse (§ 273a, subd. (a)), and the special allegation that the commission of the offense resulted in Madelyn's death due to failure to secure medical aid (§ 12022.95) was found true.  However, the jury found not true the additional allegation in count 3 that Angela personally inflicted great bodily harm on Madelyn (§ 12022.7, subd. (d)), although it found that allegation true as to Daniel.

Based on these verdicts, Angela contends (1) she was convicted of involuntary manslaughter on a theory of aiding and abetting, a theory she claims is "logically impossible."  She also contends (2) the trial court failed to further instruct on unanimity; and (3) the jury was not properly instructed on the required mental state for involuntary manslaughter.

Respondent contends that, because counsel did not object to the instructions at trial, the issues raised by Angela have been waived.  However, appellate review is permitted if any instruction affects the defendant's substantial rights, even if no objection was made at trial.  (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927 ["Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights."].)  We assume, without deciding, that the issues are properly raised on appeal.

We review the legal adequacy of a jury instruction de novo.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1211.)  "In reviewing a claim that the court's instructions were

incorrect or misleading, we inquire whether there is a reasonable likelihood the jury understood the instructions as asserted by the defendant." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.) We consider the instructions as a whole, in the context of the trial record and arguments of counsel. (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1312.) We " ' "assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " and we interpret the instructions " 'if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

We address each of Angela's arguments in turn but find no prejudicial error.

*Involuntary Manslaughter and Aiding and Abetting*

    *1. Applicable Law*

Angela first contends that her conviction for involuntary manslaughter on a theory of aiding and abetting is "logically impossible." We, however, disagree with Angela's claim that she was convicted of involuntary manslaughter on a theory of aiding and abetting and, as such, do not address the issue as framed by her. In analyzing the verdict, the jury concluded Daniel was guilty of committing the specific acts that caused the injuries to Madelyn and Angela was not. It also concluded that both Angela and Daniel had a duty to summon aid for Madelyn when necessary and failed to do so. As such, Angela was a direct perpetrator and not an aider and abettor. We arrive at this conclusion as follows.

Second degree murder instructions, as given, stated, in pertinent part, "A parent has a legal duty to care for their child. A parent has a legal duty to furnish necessary medical attendance for his or her child." This fact was emphasized during closing by the prosecutor:

> "One of these defendants acted and one of them failed to act. The result
> was the same, tragically. When you have a legal duty to protect a child,

31.

you cannot simply stand by while that child is harmed or dying and say I didn't do it. The failure to act in that circumstance is the same as inflicting the injury yourself. You have a duty to protect. You have a duty to intervene. You have a duty to provide care. When you are aware of a life-threatening condition like a baby not breathing for a substantial period of time and appearing limp and lifeless, you don't wait and see and hope for the best. You get that baby to the hospital where they can receive the care that they need."

Involuntary manslaughter instructions, as given, provided, in relevant part, that "[a]n unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life, is involuntary manslaughter." (CALCRIM No. 580.) The jury was instructed on the elements of involuntary manslaughter: (1) the defendant committed a crime (alleged here as child abuse/endangerment, simple battery and/or simple assault) or a lawful act in an unlawful manner; (2) the defendant committed the crime or act with criminal negligence; and (3) the defendant's acts caused the death of another person.

Both Angela and Daniel were convicted in count 3 of section 273a, subdivision (a) child abuse/endangerment, one of the crimes alleged as the basis for the involuntary manslaughter charge. To prove a defendant guilty of count 3, the jury had to find that the defendant, having custody of a child, willfully caused or permitted the child's person or health to be injured. (CALCRIM No. 823.) Daniel was convicted in count 3 for his personal acts of injury to Madelyn, as evidenced by the jury's finding on the section 12022.7 enhancement — for personal infliction of great bodily injury (CALCRIM No. 3162), as well as his failure to seek medical aid, as evidenced by the jury's finding under section 12022.95, that he permitted a child to suffer (CALCRIM No. 3250). Angela, on the other hand, was convicted on count 3 only for her failure to seek medical attention for Madelyn when necessary.

By convicting Angela, in count 3, of child abuse/endangerment likely to produce great bodily harm or death for her failure to seek medical attention for Madelyn, she was

32.

necessarily also found guilty of involuntary manslaughter as a direct perpetrator, and not on a theory of aiding and abetting.

### 2. *Unanimity Instruction*

Angela also contends her involuntary manslaughter conviction must be overturned due to the lack of a unanimity instruction. Angela argues the jury could have found her guilty of involuntary manslaughter based on the infliction of a fatal injury Madelyn or on her failure to obtain medical care for Madelyn following the event, and the trial court failed to instruct the jury that it had to unanimously agree which act Angela committed to be guilty of count 1. We find no error.

At trial, the trial court instructed the jury on unanimity with CALCRIM No. 3500 as follows:

> "The defendants are charged with murder in Count 1 sometime during the period of October 11, 2014, to October 12, 2014. [¶] Defendant Angela Jimenez Ramirez is charged with assault on a child causing death in Count 2 sometime during the period of October 11, 2014, to October 12, 2014. [¶] The defendants are charged with child abuse in Count 3 sometime during the period of July 30, 2014, to October 12, 2014. [¶] The People have presented evidence of more than one act to prove that the defendant committed these crimes. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he or she committed."

We agree that Angela has forfeited her claim of instructional error. She did not object to the trial court instructing the jury with CALCRIM No. 3500. " " 'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " " (*People v. Hill* (1992) 3 Cal.4th 959, 997, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

Nevertheless, even if Angela's argument is not forfeited, it is without merit. "When considering a claim of instructional error, we view the challenged

33.

instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)

Angela argues reversable error because the unanimity instruction, as given, did not mention involuntary manslaughter, and the prosecutor argues two different acts which could support the involuntary manslaughter charge. However, while the unanimity instruction given did not specifically mention involuntary manslaughter, jury instructions are not read in isolation, but rather in the context of the entire charge. (*People v. Houston, supra,* 54 Cal.4th at p. 1229.)

As noted above, CALCRIM No. 3500 instructed the jurors that they had to unanimously agree on the acts that formed the basis for the charge of murder in count 1. The involuntary manslaughter instructions explained that involuntary manslaughter is a lesser-included offense of murder and that the difference between murder and involuntary manslaughter was not based on the actions of the defendant, but on the defendant's state of mind. A reasonable juror would understand that if they had to unanimously agree on the act underlying the murder charge, they would have to unanimously agree on the act or acts underlying the involuntary manslaughter charge.

In addition, CALCRIM No. 580 instructed that the involuntary manslaughter conviction was based on the commission of one of three crimes: child abuse/endangerment, simple assault, and simple battery. And the instruction included the following: "You may not find the defendant guilty unless of all of you agree that the People have proved that the defendant committed at least one of these alleged acts and you all agree that the same act or acts were proved." Thus, the jury was instructed that they had to agree on which act formed the basis of the involuntary manslaughter conviction.

The jury instructions as given made clear that the jury had to unanimously agree on whether Angela committed involuntary manslaughter by failing to provide medical

34.

care for Madelyn or because she was responsible for the act or acts that injured her. The jury's true finding on the section 12022.95 enhancement for failure to provide medical aid shows unanimous agreement on that issue. We find no error.

### 3. *Mental State for Involuntary Manslaughter*

Finally, Angela argues that the involuntary manslaughter instructions failed to require a concurrence of an act and criminal negligence. Angela's argument is that the prosecution's theory of guilt was that Daniel and Angela failed to obtain medical care for Madelyn when needed — "[t]he prosecution theory was thus based on the failure to act and not the commission of an affirmative act." Angela alleges that, while the instruction on second degree murder adequately conveyed this requirement, the jury instruction for involuntary manslaughter failed to do so. Angela argues, "This omission was prejudicial because it permitted the jury to find Angela guilty of involuntary manslaughter based on her failure to seek timely medical care for [Madelyn] without finding that Angela's failure to act was criminally negligent." We find that, while the duty to provide care language was not duplicated in the involuntary manslaughter instruction, no prejudicial error occurred.

Again, the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or a particular instruction. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016.)

The trial court instructed the jury on the requirement of the union of act and intent with CALCRIM No. 252, in relevant part, as follows:

> "The crimes or other allegations charged require proof of a union or joint operation of act and wrongful intent. [¶] … [¶] The following crimes require criminal negligence: [¶] Child abuse as charged in Count 3, and involuntary manslaughter, a lesser included crime of Count 1. The act and the specific intent and/or mental state required are explained in the instruction for each crime."

35.

CALCRIM No. 580, the instruction on involuntary manslaughter, stated that the crime or act that the defendant committed must be done with criminal negligence, and cited three predicate crimes that could form the basis for involuntary manslaughter: child endangerment, simple assault, and simple battery.

While CALCRIM No. 580 only specifically referred to "acts" and not a failure to act, that instruction does incorporate this concept in multiple different ways. CALCRIM No. 240, the instruction on causation, explained that an "act or omission" could cause injury or death. The fact that parents have a duty to provide medical care for their child was explained in the instructions for murder (CALCRIM No. 520). And the involuntary manslaughter instruction (CALCRIM No. 580) informed the jury that the difference between murder and manslaughter involved the state of mind of the defendant  In other words, the jury would have understood that involuntary manslaughter could be premised on the same conduct as the murder charge, including the failure to provide medical care.

And the court instructed with CALCRIM No. 3406B, in relevant part, that Angela could not be convicted of the crime of involuntary manslaughter unless the jury found that she had the required mental state:

> "The defendant is not guilty of the following crimes on a theory of failing to provide medical care if he or she did not have the intent or mental state required to commit the crime because he or she reasonably did not know a fact or reasonably and mistakenly believed a fact: involuntary manslaughter, assault on a child causing death, assault with force likely to cause great bodily injury, simple assault, or child abuse."

Finally, the jury was instructed that involuntary manslaughter could be premised on the commission of the crime of child abuse/endangerment as defined in CALCRIM No. 823 (§ 273a, subd. (b)), in relevant part as follows:

> "To prove that the defendant is guilty of this crime, the People must prove that: [¶] One, the defendant, while having care and custody of a child, willfully caused or permitted the child's person or health to be injured; [¶] And two, the defendant was criminally negligent when he or she caused or permitted the child to be injured."

36.

These instructions, as taken together, repeatedly and correctly instructed the jury that criminal negligence was required to convict Angela of involuntary manslaughter whether she caused Madelyn's death through an affirmative act or through her failure to act. This was repeated in the prosecutor's arguments in closing, as follows: "The general principles that apply to this case is that a parent has a legal duty to care for their child. If you conclude that one of the accused people, Angela and/or Daniel, owed a duty to Madelyn, and that they failed to perform that duty, his failure or her failure to act is the same as if they had done the act themselves." The prosecutor further clarified: "When it comes to an act or a failure to act, the same liability is applied to the person that acted and the person that failed to act. There is absolutely no distinction under the law between the two."

The jury clearly understood the legal principle that a failure to act in light of a legal duty was equivalent to an affirmative act in the context of both involuntary manslaughter and murder. We therefore find no prejudicial error in the instructions as given.

III.     DID THE TRIAL COURT ERR IN ADMITTING DANIEL'S HEARSAY STATEMENTS AGAINST ANGELA?

Angela also argues that the trial court improperly admitted Daniel's hearsay statement against her. She also argues that the cautionary instruction given---that the jury could consider Daniel's out-of-court statements only against Daniel and not against her, was an unrealistic and impractical expectation. We find no error.

*Procedural Background*

Prior to trial, Angela filed a motion in limine asking the trial court to exclude all of Daniel's out-of-court statements. Angela objected to the testimony based on hearsay (Evid. Code, § 1200) and the *Aranda/Bruton*[5] rule, arguing that Daniel's statements

---

[5]     *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*); *Bruton v. U.S.* (1968) 391 U.S. 123 (*Bruton*).

would necessarily be attributed to her and that she would not be able to cross-examine him on those statements.

At the hearing on the motion, Angela's counsel focused on the *Aranda/Bruton* aspects of the objection.[6] Counsel's argument was that this was not a "typical *Aranda/Bruton* type of case" where codefendants point the finger at each other, but because the defendants were married and jointly the parents of Madelyn, "each one of the statements and actions and knowledge, are going to be imputed to the other." Counsel argued that redaction could not cure the issue and exclusion of Daniel's statements was required. Counsel also argued that Daniel's statements could give rise to a *Sanchez*[7] issue, because the experts, in their grand jury testimony, relied on the statements of both Daniel and Angela in forming their opinion. The prosecutor agreed that a limiting instruction could be given to the jury, and the jury could be re-advised "any time the statement comes up."

The trial court and parties then discussed specific statements at issue. Angela's counsel argued that Daniel's timeline of events written on October 15 at the hospital and his statement to law enforcement on October 22 should be excluded.

At a later hearing, the trial court stated the prosecutor intended to admit the following statements: (1) Angela and Daniel's statements to law enforcement on October 12; (2) Angela and Daniel's timelines provided to law enforcement October 15; and (3) Angela and Daniel's statement to law enforcement on October 22. The prosecutor argued all of Daniel's statements should be admitted, but proposed the following redactions from the October 22 statement that: (1) Angela had been abused as a child; (2) Angela recorded the video of Daniel dancing with Madelyn; (3) Angela was taking psychotropic medicine; and (4) Angela being depressed or doing some research about depression.

---

**6** Daniel's attorney waived his confrontation clause rights as to Angela's statements.

**7** *People v. Sanchez* (2016) 63 Cal.4th 665.

The trial court indicated that it would allow the submission of Daniel's statements as to Daniel, only with a limiting instruction, and with any inculpatory statements made by Daniel as to Angela redacted. Angela's counsel came to an agreement with the prosecutor on redacting Daniel's statements without waiving her objection.

The jury was given a general limiting instruction, CALCRIM No. 304:

"During the trial, certain evidence may have been admitted for a limited purpose. You may consider that evidence only for that purpose and for no other. I instructed you during the trial that certain evidence was admitted only against certain defendants. You must not consider that evidence against any other defendant."

The jury was also instructed with CALCRIM No. 305:

"You have heard evidence that defendant Angela Jiminez-Ramirez made a statement out of court. You may consider that evidence only against her, not against any other defendant. [¶] You have heard evidence that defendant Daniel Ramirez made a statement out of court. You may not consider that evidence only against him, not against any other defendant."

*Applicable Law and Analysis*

On appeal, Angela alleges Daniel's out-of-court statements were hearsay as to her and not admissible unless a hearsay exception applied, an exception that was never identified by the prosecutor nor ruled on by the trial court. As argued by Angela, "The trial court therefore erred by overruling the defense hearsay objection unless the limiting instruction was adequate to eliminate the prejudice to Angela from the admission of Daniel's hearsay statements." Angela claims that the instruction as given here "simply made no sense in the context of the evidence admitted at trial and how the jury was going to use that evidence to evaluate [Angela's] credibility."

We reject Angela's argument for several reasons.

First, the *Aranda/Bruton* rule is not applicable here as it addresses a specific issue that arises at joint trials when the prosecution seeks to admit the out-of-court statement of a nontestifying defendant that incriminates a codefendant. " '*Aranda* and *Bruton* stand

39.

for the proposition that a "nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given." [Citation].' [Citation.] The United States Supreme Court 'limited the scope of the *Bruton* rule in *Richardson v. Marsh* (1987) 481 U.S. 200.… The court explained that *Bruton* recognized a narrow exception to the general rule that juries are presumed to follow limiting instructions, and this narrow exception should not apply to confessions that are not incriminating on their face, but become so only when linked with other evidence introduced at trial. (*Richardson, supra,* at pp. 206-207.) That is because, " [w]here the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence." (*Id.* at p. 208.)' " (*People v. Homick* (2012) 55 Cal.4th 816, 874, fn. omitted; see *People v. Fletcher* (1996) 13 Cal.4th 451, 463-463.) Here, of course, Daniel testified in his own defense and is therefore not a nontestifying codefendant.

Second, Evidence Code section 1235 provides, "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with [Evidence Code] section 770, which provides in turn that an out-of-court statement by a witness "shall be excluded" unless the witness is given an opportunity to explain or deny the statement when testifying, Thus, Daniel's out-of-court statements were properly admitted as a hearsay exception as he was given the opportunity to explain or deny the statements.

In addition, and most importantly, none of Daniel's out-of-court statements as redacted were facially incriminating of Angela. Its incriminatory effect depended entirely on its linkage to other evidence. Under these circumstances, the trial court's limiting instruction properly guided the jury's consideration of the testimony. (*Richardson v. Marsh, supra,* 481 U.S. at p. 206 ["Ordinarily, a witness whose testimony

40.

is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant."].)

As for Angela's argument that the limiting instruction was ineffective, she cites *People v. Gibson* (1976) 56 Cal.App.3d 119 for the proposition that it is "the essence of sophistry and lack of realism" to think that an instruction admonishing the jury to consider highly prejudicial evidence only for its limited relevant purpose can have any realistic effect. (*Id.* at p. 130.)

*Gibson*, however, involved the admission of evidence of other crimes committed by the defendant. The court concluded the evidence was so inherently prejudicial that a limiting instruction could not cure the prejudice. Later authority of the same appellate district that decided *Gibson* holds that *Gibson* is "inapposite" where "[t]here is no evidence that the jury ignored the court's instruction and committed misconduct by using limited evidence for an improper purpose. 'In the absence of evidence to the contrary, the presumption [that the jury adhered to the limiting instructions] will control.' " (*People v. Zack* (1986) 184 Cal.App.3d 409, 416.)

There is no evidence in this case that the jury disregarded the court's limiting instructions. It is not clear which specific statements Angela believes prejudiced her. The statement which comes closest to implicating Angela is Daniel's claim that Madelyn stopped breathing during her 10:00 p.m. feeding on the night of October 11, and that he revived her with a Q-tip, which he asked Angela to retrieve for him. However, the fact that Daniel said Madelyn stopped breathing was discussed in both of Angela's interviews with law enforcement. Angela also admitted, in her second police interview, that Daniel asked her for a Q-tip and that he cleared Madelyn's nose with it. Angela does not contest the admissibility of her police interviews.

We therefore reject Angela's claim that the limiting instructions were somehow inadequate to ensure the jury considered Daniel's out-of-court statement only against him and not her, and we presume the jury followed the trial court's instructions. (See *People*

41.

*v. Richardson* (2008) 43 Cal.4th 959, 1004; *People v. Davis* (2005) 36 Cal.4th 510, 537.) Our Supreme Court has reaffirmed this rule: "We reject as entirely speculative defendant's assertion that these limiting instructions were inadequate. 'Any prejudice that the challenged information may have threatened must be deemed to have been prevented by the court's limiting instruction to the jury. We presume that jurors comprehend and accept the court's directions. [Citation.] We can, of course, do nothing else. The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.' " (*People v. Homick, supra,* 55 Cal.4th at pp. 866–867.) These repeated and plain holdings of our Supreme Court thus undermine Angela's argument that she was prejudiced by the admission of Daniel's out-of-court statements in light of his testimony at trial, her testimony, and her out-of-court statements, or that the limiting instructions given were inadequate. We reject her claim.

IV.    MUST THE ABSTRACT OF JUDGMENT BE CORRECTED?

Finally, Angela contends that the abstract of judgment incorrectly indicates that both her convictions are serious and violent felonies. Violent felonies are listed in section 667.5, subdivision (c) and serious felonies are listed in section 1192.7, subdivision (c). Neither involuntary manslaughter or felony child abuse are listed in these sections, nor is the section 12022.95 enhancement listed.

In addition, Angela contends the abstract of judgment should be amended to accurately reflect the crime of count 3 as felony child abuse, not assault on a child causing death. Although the abstract of judgment correctly states that Angela was convicted in count 3 of section 273a, subdivision (a), it incorrectly lists the crime as "assault child cause death." Assault on a child causing death was charged in count 2 under section 273ab, subdivision (a), of which Angela was acquitted.

We agree with the parties that the abstract of judgment must be amended to reflect that neither of Angela's convictions are for a serious or violent felony and to reflect that

the crime in count 3 is felony child abuse, not assault on a child causing death. (*People v. Mitchell* (2001) 26 Cal.4th 181, 199.)

Additionally, although neither party raises the issue, we direct the trial court to correct the errors in the calculation of custody credits in the abstract of judgment (the probation report and reporter's transcript state Angela had 4,516 custody credits; the minute order and abstract of judgment 4,519).

## DISPOSITION

The abstract of judgment is amended to reflect that neither of Angela's convictions are for a serious or violent felony; to reflect that the crime in count 3 is felony child abuse, not assault on a child causing death; and to correct the amount of custody credits. The clerk of the court is directed to prepare a new abstract of judgment reflecting these changes and send a copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

FRANSON, J.

WE CONCUR:

LEVY, Acting P. J.

POOCHIGIAN, J.

43.